IRVING, J.,
for the Court.
¶ 1. Alumax Extrusions appeals from an order of the Circuit Court of DeSoto County, affirming the order of the Workers’ Compensation Commission which awarded Paul Hankins, a former employee of Alu-max, permanent partial disability benefits. The sole issue presented by Alumax is whether the Commission’s finding — that Hankins had suffered permanent disability to the extent that he was no longer employable as a long-haul truck driver — is supported by substantial evidence.
¶ 2. Our review of the record reveals that there is substantial evidence to support the Commission’s decision. Therefore, we affirm the judgment of the circuit court affirming the decision of the Commission.
FACTS
¶ 3. Paul Hankins, a sixty-year-old resident of Coldwater, Mississippi, worked as a truck driver for Alumax. Although he had worked for thirty-five years as a long-haul driver, he had worked for Alumax for only five of those years.
¶ 4. As a long-haul driver for Alumax, Hankins hauled aluminum extrusions on a flatbed trailer from Memphis, Tennessee to other cities such as Kansas City, Missouri and Oklahoma City, Oklahoma. He generally made three trips per week. Upon arriving at his destinations, Hankins was required to climb on top of his trailer to remove or roll up two thirty-foot tarpaulins. His trailer was usually ten to twelve-foot high, and each tarpaulin generally weighed approximately 300 pounds.
¶ 5. On October 17, 1995, shortly after arriving in Oklahoma City to make a delivery, Hankins stepped off the back of his trailer and fell onto the concrete, fracturing his right hip. He was treated on the day of the accident for his injury by company doctor and orthopedic surgeon, Dr. Andrew H. Crenshaw. Dr. Crenshaw immediately took Hankins to surgery and used a metal compression screw to repair Hankins’s hip which had fractured into four pieces.
¶ 6. On February 19, 1996, Dr. Cren-shaw released Hankins to light duty but continued Hankins’s physical therapy regimen until August 12, 1996, at which time Dr. Crenshaw released Hankins to full duty with a fifty-pound lifting restriction. Hankins next saw Dr. Crenshaw in January 1997. At that time, Hankins’s right leg was noticeably shorter than his left leg, causing Hankins to suffer back pain. Hankins was also having some problem with the opposite knee. At that time, Dr. Crenshaw prescribed a shoe lift for Han-kins’s right foot and placed him on Motrin.
¶ 7. Dr. Crenshaw saw Hankins again on April 8. Hankins was still having some back pain but could still work at regular duty. Hankins’s main limitation was in moving the tarpaulins which weighed between 250 and 300 pounds. Dr. Crenshaw recommended a lighter weight tarpaulin and ordered a functional capacity evaluation (FCE) to assess Hankins’s work capabilities. The FCE was done by one of Dr. Crenshaw’s physical therapists who agreed with Dr. Crenshaw that Hankins could continue driving trucks. Alumax accom *588 modated Hankins by proving him with a lighter tarpaulin.
¶ 8. Dr. Crenshaw gave Hankins a fourteen percent permanent impairment to the right lower extremity due to the fact that Hankins retained hardware in his hip and the shortened right leg. Dr. Crenshaw last saw Hankins on November 11, 1997. At that time, he saw no change in Han-kins’s condition and felt that Hankins could still work as a truck driver.
¶ 9. Hankins was next seen by Dr. Mark Steven Harriman. Dr. Harriman first saw Hankins on February 5, 1998, for an independent medical examination. Dr. Harri-man conducted a physical examination and determined that Hankins did -not have a leg-length inequality but Hankins’s “pelvis seemed to be rotated a bit.” X-rays showed the fracture of the hip to be in good condition. X-rays also showed that Hankins had suffered a twenty-five to thirty percent compression of his L-4 vertebra. Dr. Harriman thought Hankins’s back pain was severe enough for Hankins to consider some type of back block. He also thought that the impairment rating given by Dr. Crenshaw was appropriate although Harriman had not considered the fact that Hankins had a compression fracture. He determined that “[t]he lumbar spine fracture measured twenty percent” which equals to a “five percent impairment rating to the whole person for that injury.” He further determined that “[t]he combined whole person impairment was ten percent.”
¶ 10. Dr. Harriman next saw Hankins in July 1998. At that time, Hankins told Dr. Harriman that Hankins’s back pain had been getting increasingly worse and was becoming harder to tolerate. Hankins was driving approximately 3,000 miles per week and - was working 70-hour weeks. Dr. Harriman was of the opinion that Han-kins symptoms “were possibly due to the compression fracture and due to some worsening of some degenerative changes in his back.” He thought that Hankins’s fall was the cause of both the compression fracture of the spine and the hip fracture. Dr. Harriman last saw Hankins on August 21, 1998. At that time, Hankins advised Dr. Harriman that Hankins was doing well although he had suffered some pain from operating a tractor for a couple of hours to do some bush hogging. During this visit, Dr. Harriman released Hankins to return to work.
¶ 11. Dr. Alan J. Kraus, a pain management specialist, first saw Hankins on April 9, 1998, on a referral from Dr. Harriman. During Hankins’s first visit, Dr. Kraus performed an epidural block which eased Hankins’s back pain for approximately three to four weeks. When Dr. Kraus saw Hankins again on July 16, 1998, Hankins was complaining about numbness in his legs. As a result of this complaint, Dr. Kraus suggested that Hankins have an MRI or CT scan performed. Whien the MRI was performed on March 22, 1999, it showed some degenerative disk disease “and a slight loss of the h-A vertebral body consistent with the remote compression fracture.” Dr. Kraus last saw Han-kins on March 26, 1999. At that time they discussed doing some additional blocks, some facet injections and possibly a sacroiliac injection. However, these were never done. Dr. Kraus deferred to Drs. Cren-shaw and Harriman on the question of whether Hankins could continue to drive long hauls.
¶ 12. All the while Hankins was being treated by the various doctors, he was attempting to work. On April 28, 1996, he began working for two to four hours a day while continuing to receive temporary partial disability benefits. On May 26, 1996, Hankins began driving short hauls to Birmingham and Arkansas. He made these *589 short-haul trips approximately twice a week. He then extended the distance of the trips he made until he was traveling five hundred to one thousand miles one-way. He made approximately $400 to $600 a week for driving short-haul assignments compared to approximately $800 or more a week for long-haul jobs.
¶ 13. Hankins subsequently returned to Dr. Crenshaw because of back pain. Dr. Crenshaw could not find any reason for Hankins’s back pain except arthritis and a leg-length difference attributable to his hip replacement. He prescribed a one and one half inch shoe lift for Hankins to compensate for the length difference. However, Hankins continued to experience back pain. As a result, Alumax referred him to Dr. Harriman. As stated already, Dr. Harriman diagnosed Hankins with a compression fracture at L-4 and referred Hankins to Dr. Kraus who performed an epidural block.
¶ 14. According to Hankins, after a period of eight months of light duty work, Alumax gave him a choice of returning to long hauling, returning to packing, or quitting. At that time, Hankins performed four different jobs for Alumax. First, he drove long hauls until August of 1998. During this period, Hankins switched to lighter, 100-pound tarpaulins, when they were available. Alumax purchased these tarpaulins for Hankins at Dr. Crenshaw’s recommendation. Second, from August 1998 to March 1999, Hankins worked as a dock worker in the shipping department. Performing this job required him to walk twelve hours a day on concrete, but he was not required to bend or lift. Third, Han-kins hauled short runs when available for a period of time. Finally, he worked briefly in packing, but was physically unable to perform the strenuous, repetitive bending and standing required by this job. Han-kins only worked at this job for two hours before asking Terry Bass, his safety manager, for a transfer. Hankins then returned to shipping where he worked for eight months.
¶ 15. In March 1999, Bass told Hankins that he could not remain on the dock and had to return to packing or long hauls. Hankins asked for work as a short-haul driver, a job in security, or a job in the office to map out deliveries. Bass affirmed that no openings were available in these divisions. Hankins also interviewed for a dispatcher job at Alumax but was not hired in that capacity. Believing that he could not withstand returning to packing, Hankins returned to driving long hauls. After three and a half weeks of driving long hauls, he advised his employer that he was physically unable to continue that line of work. Hankins soon after tendered his resignation.
¶ 16. In due course, Hankins filed a petition to controvert with the Mississippi Workers’ Compensation Commission. An administrative hearing was held on the matter, and the administrative law judge ordered that the employer pay compensation benefits to Hankins for “permanent partial disability benefits at a rate of $252.59 per week for 450 weeks beginning on April 8, 1997....” Alumax filed an appeal, and a hearing was held before the Full Commission which issued a unanimous order affirming the ruling of the administrative judge. Alumax then appealed unsuccessfully to the Circuit Court of DeSoto County, resulting ultimately in this appeal before us.
¶ 17. Additional facts will be related during the discussion of the issue.
ANALYSIS AND DISCUSSION OF THE ISSUE
¶ 18. Alumax argues that the administrative judge erred when she ruled that Hankins was disabled from working *590 as a long-haul truck driver.[1] It points out that all medical proof was favorable that Hankins could return to work as a long-haul driver and that Hankins quit his job on his own volition without medical justification. Hankins counters that substantial evidence in the record supports the Commission’s decision; therefore, that decision should not be disturbed.
¶ 19. After considering all of the evidence before her, the administrative judge found that Hankins’s actual good faith efforts to repeatedly work as a long-haul driver over the course of approximately eighteen months were of greater probative value in determining his industrial capacity than were. the medical estimates of his functional impairment. Consequently, she ordered that Alumax pay permanent partial disability benefits at a rate of $252.59 per week for 450 weeks
¶ 20. “Mississippi Code Ann. § 71-3-7 requires that compensation shall be payable for ‘disability’ for an injury arising out of and in the course of employment. The question of degree and duration of disability is one of fact. The degree of disability is determined by (1) actual physical injury and (2) loss of wage earning capacity.” Spann v. Wal-Mart Stores, Inc., 700 So.2d 308, 312(¶ 20) (Miss.1997) (citations omitted). Our supreme court has further held that “disability need not be proved by medical testimony as long as there is medical testimony which will support a finding of disability.” Hall of Mississippi, Inc. v. Green, 467 So.2d 935, 938 (Miss.1985).
Though the disability and extent thereof must be supported by medical findings ... “compensation may be allowed for disabling pain in the absence of positive medical testimony [and objective medical findings] as to any physical cause.... [This is especially true when there is] evidence of an accident followed by disabling pain ..., at least in the absence of circumstances tending to show malingering or to indicate that the claimant’s testimony as to pain is not inherently improbable, incredible or unreasonable, or that the testimony is untrustworthy.”
Penrod Drilling Co. v. Etheridge, 487 So.2d 1330, 1334 (Miss.1986).
¶ 21. The Commission found that Han-kins had permanent medical impairments attributable to his injury. It acknowledged that Dr. Crenshaw, Dr. Harriman, and Dr. Kraus assessed only a fourteen percent permanent medical impairment to Hankins’s right lower extremity which is equal to a five percent permanent medical impairment to the body as a whole. The Commission pointed out that the doctors also assessed a five percent permanent impairment attributable to claimant’s compression fracture. It later discussed that Dr. Rahul Vohra assessed a ten percent permanent impairment to the right lower extremity for the hip fracture and a five permanent impairment to the body as a whole attributable to claimant’s lumbar spine. Although Dr. Vohra did not attribute Hankins’s compression fracture to his October 17, 1995 injury due to a lapse of time between the injury and his complaints of back pain, the Commission recognized that Dr. Crenshaw, Dr. Harriman, and Dr. Kraus attributed claimant’s back pain to the injury. It further determined that the opinions of Drs. Crenshaw, Harriman, and Kraus concerning the etiology of Hankins’s back pain had more probative value than *591 those of Dr. Vohra since the former doctors had the opportunity to examine and evaluate Hankins for a longer period of time and closer in time to the injury. The Commission concluded that a preponderance of the evidence indicates that Han-kins’s work-connected injury substantially caused or contributed to his lumbar impairment.
¶22. The Commission also found that Hankins’s permanent medical impairments resulted in a loss of wage earning capacity. It acknowledged Dr. Crenshaw’s testimony that Hankins could return to long-haul trucking if he used light weight tarpaulins. The Commission, however, pointed out that Dr. Crenshaw did not know that Han-kins had a compression fracture at L-4 or that Hankins had received subsequent medical treatment by Drs. Harriman and Kraus when he made this statement.
¶ 23. The Commission further found that Dr. Harriman, the physician who treated Hankins after Dr. Crenshaw, released claimant to return to work as a truck driver on August 21, 1998. It recognized, however, that his testimony did not differentiate between short-haul and long-haul driving, an important difference since Hankins testified that he could drive short hauls but that he would earn only $400 a week.
¶24. The Commission acknowledged that Dr. Klaus, the pain management specialist referred by Dr. Harriman, testified that nothing in his course of treatment led him to believe that claimant could not return to long-haul trucking, but he deferred to Dr. Crenshaw and to Dr. Harriman as the treating physicians regarding Han-kins’s employability.
¶ 25. The Commission found that Dr. Vohra, the independent medical examiner, stated that he, “believe[d] claimant could return to long-haul trucking.” It noted, however, that Dr. Vohra had only seen Hankins once and, contrary to the opinions of Dr. Crenshaw and Dr. Harriman, opined that Hankins’s compression fracture was not related to his October 17, 1995 injury.
¶ 26. The Commission noted Hankins’s actions of engaging in light duty work; his continual complaints about severe back pain and the numerous doctors he visited for treatment; his repeated inquiries of his employer for work other than long-haul driving and packing, both of which aggravated his back pain; and his subsequent resignation despite his lacking only a year and a half to retire with a full pension with the Teamsters. It pointed out that these facts were uncontradicted by the record and were corroborated by the employer’s representative, claimant’s wife, the nurse manager, and the medical evidence. The Commission further noted that its assessment of Hankins, Hankins’s employment, and medical histories were consistent with his wife’s description of him as the type of man who has never stayed home, never complained, and never saw a doctor.
¶ 27. Alumax next argues that the orders of the administrative judge and of the Full Commission, as affirmed by the circuit court, are erroneous because they failed to note that no legitimate job search had been made by Hankins. According to Alumax, the administrative judge should have at least required Hankins to seek work elsewhere in the open market as a truck driver, short haul or long haul.
¶ 28. The record indicates that Hankins did in fact make efforts to find other em- . ployment. In her order, the administrative judge found that Hankins had asked for light duty work, after being engaged in the more strenuous tasks of long-haul trucking and packing but was told by his manager that none was available. During this time frame, Hankins applied for a *592 dispatch job with Alumax, however, he was not hired for that position. The administrative law judge further pointed out that Hankins testified that he had asked a union representative for help securing other employment, as he could drive short hauls, but that he had not been successful in securing employment as a shorthaul driver. She further acknowledged Hankins’s testimony that he had asked about other jobs by word of mouth. Finally, the judge pointed out that Hankins was presently employed as a bus driver for the county school system for one hour twice a day. We, therefore, find no merit in Alumax’s contention that Hankins did not search for other employment.
¶ 29. Alumax further argues that the administrative judge erred when he used Hankins’s wages of $400 as a short-haul driver/dock loader as the basis awarding benefits. It explains that this amount was derived from work done by Hankins during his recovery (light duty assignment) and concludes that the use of this amount provides a false perception of wage loss by Hankins.
¶ 30. In resolving the issues presented, we are mindful of our standard of view which is very limited. It has been stated as follows:
The standard of review in workers’ compensation cases is limited. The substantial evidence test is used. The Workers’ Compensation Commission is the trier and finder of facts in a compensation claim.. This Court will overturn the Workers’ Compensation Commission decision only for an error of law or an unsupported finding of fact. Reversal is proper only when a Commission order is not based on substantial evidence, is .arbitrary or capricious, or is based on an erroneous application of the law.
Weatherspoon v. Croft Metals, Inc., 853 So.2d 776, 778(¶ 6) (Miss.2003) (citations omitted).
¶ 31. Adhering to our standard of review, we find that ample evidence exists to support the Commission’s finding that Hankins suffered a loss of wage earning capacity of $400 per week. The undisputed testimony demonstrates that Hankins earned half of his regular salary while driving short hauls or working in the loading and packing divisions. Hankins testified that he earned approximately $400 when he worked on the dock and when he drove short hauls. Moreover, on cross-examination, Terry Bass, safety manager at Alumax, admitted that Hankins, working on the loading dock or in packing, would probably make only half the salary Hankins made driving long hauls. It was stipulated at trial that Hankins’s average weekly wage on October 17, 1995, the day he was injured, was $800.07. We therefore find no error.
¶32. Accordingly, we find substantial evidence to support the Commission’s finding. Therefore, we affirm the judgment of the circuit court which affirmed the decision of the Commission.
¶ 33. THE JUDGMENT OF THE CIRCUIT COURT OF DESOTO COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., BRIDGES AND LEE, P.JJ., MYERS, CHANDLER, BARNES AND ISHEE, JJ„ CONCUR. GRIFFIS, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.

. It is the decision of the Full Commission that is reviewable, on appeal. Since the Full Commission affirmed the order and findings of the administrative law judge, those findings become the findings of the Commission. Hence, we refer to the findings of the administrative law judge as the findings of the Commission.